UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EZELL WALTER GAINES, III,<br><br>Defendant. | Criminal No. 4:26cr2 |

## MEMORANDUM OPINION

On March 30, 2026, Defendant Ezell Walter Gaines, III ("Defendant" or "Mr. Gaines") filed a Motion to Suppress Fruits of Unlawful Vehicle Search (the "Motion to Suppress"). Mot., ECF No. 26. On June 16, 2026, the parties appeared before the Court for a hearing on the Motion to Suppress. Min. Entry, ECF No. 39. On July 10, 2026, the Court issued an Order granting the Motion to Suppress and noting that the Court's reasoning for its ruling would follow in a separate memorandum opinion. Order, ECF No. 40. This Memorandum Opinion provides the basis for the Court's ruling.

## I.    FACTUAL BACKGROUND[1]

On December 12, 2025, members of an investigative team coined "Operation Bold Blue Line" were investigating a suspected narcotics organization in Hampton, Virginia. Operation Bold Blue Line is a joint initiative between the Hampton Police Department ("HPD") and the Virginia State Police ("VSP") which aims to reduce vio-

---

[1] This factual background reflects evidence received at the hearing and set forth in the parties' submissions. Accordingly, any assertions herein without citations to the docket were derived from the June 16, 2026 hearing.

lent crime in Hampton. On the night of December 12, 2025, there were two different units working on the investigation: a plain-clothes surveillance unit and a uniformed takeaway unit. Prior to 5:00 p.m., the surveillance unit began observing a residence at 11 Clover Street in Hampton, Virginia (the "Clover Residence"). Mot. at 2, ECF No. 26. Meanwhile, the officers in the takeaway unit were stationed outside of the direct circle of the surveillance, positioned to follow vehicles involved in the investigation as directed and to conduct traffic stops. Specifically, the takeaway unit worked at the direction of the surveillance unit and conducted traffic stops with the purpose of furthering the narcotics investigation.[2]

At the Clover Residence, the surveillance team observed two people, including a person later identified as Mr. Gaines, leaving the residence and getting into a blue Volkswagen SUV (the "Volkswagen"). Gov't Resp. Opp'n at 2, ECF No. 29. Mr. Gaines got into the driver's seat, and an individual carrying a bookbag got into the passenger seat. *Id.*

Mr. Gaines then drove the Volkswagen to 19 Melborne Place in Hampton, Virginia (the "Melborne Residence"). Mot. at 2–3, ECF No. 26. There, the surveillance team observed the passenger get out of the Volkswagen and get into a Hyundai Genesis. Resp. Opp'n at 2, ECF No. 29. Mr. Gaines exited the Volkswagen and entered the Melborne Residence carrying a small black plastic bag. Mot. at 3, ECF No. 26. He

---

[2] In addition to the traffic stop at issue in this case, the Operation Bold Blue Line investigative team initiated two other traffic stops of individuals leaving the Melborne and Clover Residences that evening. Mot. at 3 n.1, ECF No. 26.

exited the Melborne Residence carrying a larger white Marshall's bag. *Id.* Mr. Gaines then reentered the Volkswagen and drove away. *Id.*

HPD Detective Adam Woolard ("Detective Woolard") was working the takeaway unit. He was stationed in an unmarked car and told to maintain visual on the Volkswagen once it left the Melborne Residence. He eventually located the Volkswagen and began following it, ultimately pulling up next to it. At some point, Detective Woolard contends that the Volkswagen, now known to be driven by Mr. Gaines, cut him off in traffic without using a turn signal, and then proceeded to cut off another vehicle without using a turn signal. As a result, Detective Woolard radioed to his colleagues that Mr. Gaines had committed multiple traffic violations: failure to signal, improper lane change, and failure to maintain lane. Detective Woolard continued to follow the Volkswagen but could not conduct a traffic stop himself because he was in an unmarked car.

HPD Detective Logan Beasley ("Detective Beasley") was another member of the takeaway unit, also tasked with following the Volkswagen.[3] That night, he was the front-seat passenger in a marked Virginia State Police ("VSP") patrol car, driven by VSP Trooper Aiden Davis ("Trooper Davis"). After receiving radio communication that Detective Woolard had observed Mr. Gaines committing multiple traffic infrac-

---

[3] Detective Beasley was not part of the surveillance team and was not present during the surveillance of the Clover Residence or the Melborne Residence. Accordingly, he was not familiar with Mr. Gaines from any surveillance prior to the events described herein. However, the surveillance team had informed him that Mr. Gaines had exited the Melborne Residence carrying a white plastic bag.

3

tions,[4] Detective Beasley was directed to initiate a traffic stop with Trooper Davis. Five minutes later, he and Trooper Davis encountered Mr. Gaines on Settlers Landing Road in Hampton, Virginia, and attempted to catch up to the Volkswagen to conduct a traffic stop as they followed Mr. Gaines onto Interstate 64.

At approximately 5:26 p.m., Detective Beasley initiated emergency lights while Mr. Gaines was traveling on the bridge just prior to the Hampton Roads Bridge Tunnel ("HRBT"). Mot. at 3, ECF No. 26.[5] Mr. Gaines did not immediately pull over. Detective Beasley noted over his radio, "Please be advised: vehicle is not stopping. We are on the bridge. He may be trying to find a location to pull over." Mot. Ex. A at 17:26:13–20, ECF No. 26-1 ("Beasley BWC").[6] Mr. Gaines continued into the tunnel, traveling at or below the speed limit, as the police continued to follow him. Mot. at 3, ECF No. 26. Detective Beasley commented, "Speeds are only 26. I mean he may be trying to get to the other island to pull over, I'm not sure." Beasley BWC at 17:27:31–

---

[4] In addition to the three alleged traffic violations mentioned above (failure to signal, improper lane change, and failure to maintain lane), Detective Beasley was later notified that Mr. Gaines also used his cell phone to video-call a woman while driving on the bridge, which is another alleged traffic violation. Gov't Resp. Opp'n at 2, ECF No. 29.

[5] At the preliminary hearing, Detective Boone testified that after the lights were initiated, there was one exit—the Phoebus exit—where Mr. Gaines could have exited prior to the tunnel. Hr'g Tr. at 8:19–25, ECF No. 18. However, Detective Boone also agreed that there is a lot of construction in this area, and the speed limit is 55. *Id.* at 9:01–05. There is also a "pull-off" for the bridge immediately prior to the entrance of the tunnel. *Id.* at 14:24–15:04.

[6] BWC refers to body worn camera. The citations to this exhibit refer to the original timestamp in the upper right-hand corner of the video.

43. About one minute later, while still in the tunnel, Detective Beasley stated, "Still no signal. Number two lane. Still speeds 33 miles per hour. Moderate traffic. Hasn't done anything crazy." *Id.* at 17:28:22–31. Shortly after the officers exited the tunnel, Detective Beasley stated, "We are now on the south side of the HRBT. Speeds are 45 miles an hour. Hasn't increased speed or anything. Stand by for my update if it turns into a pursuit." *Id.* at 17:29:18–30. About one minute later, Detective Beasley noted that, "He has had an opportunity with the shoulder. We are going to go ahead and initiate the pursuit." *Id.* at 17:30:00–06.[7] At that point, Detective Beasley determined that Mr. Gaines did not intend to stop.

Mr. Gaines took the first exit after the HRBT ended. Mot. at 4, ECF No. 26. He proceeded through two intersections before pulling over to the right side of the road in front of a stop sign at 13th Street and West Ocean View Avenue—a residential area—in Norfolk, Virginia. *Id.* Mr. Gaines was parked approximately one to two feet away from the curb and the front wheel of his car was past the stopping line aligned with the stop sign. The cross street in front of Mr. Gaines's vehicle was a busy street. Detective Beasley ordered Mr. Gaines to turn off his car, and Mr. Gaines complied. *Id.* He also complied with subsequent orders to keep both arms outside the car, exit the car, lift up his shirt, spin around, place his hands back on his head, and walk

---

[7] At the hearing, Detective Beasley testified that there were "over four" locations where Mr. Gaines could have pulled over. However, he also acknowledged that the HRBT is a poor place to conduct a traffic stop and he would not want anyone to pull over there. He stated that a "pursuit" is not defined by speed, however, and an individual who fails to stop after emergency lights and sirens have been activated requires a "pursuit."

backwards towards the officers until he was told to stop. *Id.* At approximately 5:33 p.m., Mr. Gaines was placed in handcuffs. *Id.*

The officers asked Mr. Gaines why he didn't pull over sooner, and Mr. Gaines replied, "There wasn't anywhere to pull over." Beasley BWC at 17:34:15. Detective Beasley then read Mr. Gaines his *Miranda* rights. *Id.* at 17:34:20–32. Mr. Beasley asked Mr. Gaines, "Is there anything I'm going to find inside that vehicle?" *Id.* at 17:34:32–34. Mr. Gaines responded that he wished to exercise his right to remain silent. *Id.* at 17:34:34–37.

Detective Beasley then walked over to confer with Detective Woolard. *Id.* at 17:34:38–49. Detective Woolard said, while nodding, "So right now you are working it as an evade and you're going to inventory, correct?" *Id.* at 17:34:50–57. Detective Beasley agreed.[8] *Id.*

Detective Beasley walked back over to Mr. Gaines and asked, "does this vehicle belong to you?" *Id.* at 17:34:57–17:35:00. Mr. Gaines remained silent. *Id.* The police did not tell Mr. Gaines why they were asking that question or ask him if there was anyone nearby who could come take possession of his vehicle. Detective Beasley then stated to himself, "Alright, it is currently 5:35. I am going to be conducting an inventory of the vehicle due to it being in the middle of the roadway." *Id.* at 17:35:03–12. However, dashboard camera footage from VSP Trooper Lakey's vehicle reveals that the vehicle was not in the middle of the road, and that there was ample space for

---

[8] It is undisputed that the officers did not obtain a warrant prior to searching the vehicle.

several vehicles to pass by, if needed. Mot. at 5, ECF No. 26. Detective Beasley did not attempt to locate a tow sheet before beginning the "inventory."

At approximately 5:35 p.m., Detectives Beasley and Woolard started searching Mr. Gaines's vehicle. BWC at 17:35:12. They started in the front seats, with Detective Beasley on the driver's side and Detective Woolard on the passenger's side. *Id.* at 17:35:12–31. Within 20 seconds of beginning the search, Detective Beasley opened the center console of the vehicle and shuffled around rental paperwork for the vehicle, which clearly stated "Avis"—the name of the rental car company. *Id.* at 17:35:31–34.[9] Detective Beasley testified that he is familiar with Avis and knew that rental paperwork is an indication that a vehicle is a rental car. However, he alleges that the rental paperwork did not draw his attention that that time, because he was focused on locating valuable items in the car. The detectives continued the search, rummaging through a small personal bag on the front seat. *Id.* at 17:35:34–40.

The detectives then moved to the backseat area. *Id.* at 17:35:40–47. A white Marshall's plastic bag was on the back passenger floorboard, and a black backpack was inside the Marshall's bag. *Id.* at 17:35:47–55. Detective Beasley opened the Marshall's bag to reveal the backpack, exclaiming "Ope! What's in that backpack?" *Id.* at 17:35:55–17:36:00. As Detective Woolard began to open the backpack, Detective

---

[9] At the preliminary hearing, HPD Detective Brian Boone testified that the surveillance team knew that the vehicle was a rental prior to the search, "[d]uring the surveillance, running the tags." Hr'g Tr. at 7:14–19, ECF No. 18. At the suppression hearing, Detective Beasley stated that he was "surprised" to hear that Detective Boone testified that the surveillance team knew the car was a rental prior to the pursuit but acknowledged that Detective Boone would have provided truthful testimony under oath.

Beasley stated, "Make sure there's nothing valuable inside of there . . . I guess there's another backpack as well." *Id.* at 17:36:05–10. Detective Woolard observed some opaque, black, sealed packages inside the first backpack and Detective Beasley started to move to the other side of the vehicle. *Id.* at 17:35:10–14. Detective Beasley then turned back as Detective Woolard started to open the second backpack. *Id.* at 17:35:14–34.

Inside of those two bags, Detective Woolard discovered what later turned out to be approximately five kilograms of cocaine and $30,383 in U.S. currency. Mot. at 6, ECF No. 26; Gov't Resp. Opp'n at 3, ECF No. 29. Based on the discovery of suspected cocaine, Detective Beasley promptly called Detective Brian Boone ("Detective Boone"), who works on the high intensity drug trafficking area federal initiative, and requested him to come to the scene. Detective Beasley then searched the trunk. Beasley BWC at 17:38:18–50. The officers completed the search at 5:38 p.m. *Id.* at 17:38:50. While the officers were conducting the search, traffic was freely flowing on the street, and multiple cars drove past Mr. Gaines's car. *Id.* at 17:35:00–17:38:50.

Following the search, the officers discussed whether and how to tow the Volkswagen, tagged Mr. Gaines's belongings, and searched Mr. Gaines's person. The officers expressed repeated confusion about whether and how to tow the vehicle:

| Detective Beasley: | Now what I need to figure out is whether we need to use a state tow or whether it matters. | |
|---|---|---|
| Detective Woolard: | I say just tow it . . . just have state tow it . . . we're not going to be able to use ours since it's a rental. | *Id.* at 17:40:21–17:41:03. |
| Detective Woolard: | No, they just tow it however, wherever they get it, right? | |
| Detective Beasley: | We need to verify whether it's a rental. It is a rental. I started to run the tags. | |

| Radio: | They found what they needed on the inventory for the tow. | |
|---|---|---|
| Detective Beasley to Detective Woolard: | Are you good at that point if state calls for a tow...? | Id. at 17:43:58–17:44:01. |
| Detective Beasley to VSP Officers: | Do you guys have tow sheets? | Id. at 17:45:02–17:45:09. |
| Unknown officer: | We don't need to do a tow sheet for this. They just come pick it up. We're not impounding it. | |
| Detective Woolard: | We need to do our tow. It has to be our tow. | Id. at 17:46:29–17:46:44. |
| Detective Beasley: | Uh, I think they're just gonna come pick it up. It's not, like, a tow. | |
| Detective Woolard: | Who's gonna come pick it up? | |
| Detective Beasley: | I think they contacted the rental agency. | |
| Detective Woolard: | OK, so we're not towing anything? | |
| Unknown officer off screen: | No, we have to tow it. | |
| Detective Woolard: | No, we have to tow it. We have to tow it. | |
| Detective Beasley: | OK. | |
| Detective Woolard: | Beasley, I'll take care of our tow. | Id. at 17:47:10–17:47:21. |
| Detective Beasley: | OK. Alright, that works. | |
| Unknown speaker: | State's gonna cancel their [inaudible]. | |
| Detective Beasley: | It's not going to be a [Special Investigations Unit], it's a regular tow, correct? | Id. at 17:50:07–17:50:10. |

While discussing whether and how to tow the vehicle, Detective Beasley took a second look at the rental paperwork and allegedly learned that the vehicle was a rental. However, while reviewing his body worn camera footage at the suppression hearing, Detective Beasley acknowledged that he stated the vehicle was a rental

about one minute prior to when he allegedly first discovered the car was a rental. At 5:57 p.m., HPD Sergeant Rummel filled out an impounding record, wherein he noted that there was "nothing of value" found in the car. *See* Def. Ex. B, ECF No. 26-2. Avis, the rental car company, was never called.

## II.    PROCEDURAL HISTORY

On December 15, 2025, a criminal complaint was filed against Mr. Gaines, charging him with Possession with Intent to Distribute Cocaine as a Schedule II Narcotic Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). Crim. Compl., ECF No. 1. On December 18, 2025, Mr. Gaines was arrested and brought before Magistrate Judge Krask for his initial appearance. Min. Entry, ECF No. 6. He was remanded pending a detention hearing. *Id.* On December 23, 2025, Mr. Gaines appeared before Magistrate Judge Krask for a detention and preliminary hearing. Min. Entry, ECF No. 12. Judge Krask found probable cause to believe that the alleged crime was committed by Mr. Gaines. *Id.* However, he denied the Government's motion for detention, releasing Mr. Gaines on a bond with special conditions of release. *Id.*; Order, ECF No. 14.

On January 12, 2026, a grand jury returned a one-count indictment against Mr. Gaines, charging him with Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Indictment, ECF No. 15. On February 23, 2026, Mr. Gaines was arraigned on the indictment, entered a plea of not guilty, and demanded a trial by jury, which was scheduled for June 16, 2026. Min. Entry, ECF No. 22.

On March 30, 2026, Mr. Gaines filed the instant Motion, seeking suppression of all evidence seized from his car during the search and all data from his phone. Mot., ECF No. 26. On April 23, 2026, the Government responded in opposition. Gov't Resp. Opp'n, ECF No. 29. On April 29, 2026 and May 1, 2026, Mr. Gaines filed replies. Reply, ECF Nos. 30, 31. On May 18, 2026, the Court set a hearing on the Motion for June 16, 2026, and continued trial pending resolution of the Motion. Order, ECF No. 33.

On June 16, 2026, the parties came before the Court for a hearing on the Motion, and Detectives Beasley and Woolard testified during the hearing. Min. Entry, ECF No. 39. The Motion is ripe for adjudication.

## III.    LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV; *see United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007). Warrantless searches of "property in which individuals have a reasonable expectation of privacy," *United States v. Davis*, 997 F.3d 191, 203 (4th Cir. 2021), are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

"To prevail in a Fourth Amendment challenge, the criminal defendant bears the burden of establishing a legitimate expectation of privacy in the searched prop-

11

erty, at the time of the search, by a preponderance of the evidence." *United States v. Daniels*, 41 F.4th 412, 415 (4th Cir. 2022). After the defendant establishes a reasonable expectation of privacy, the burden shifts to the government, which must demonstrate, by a preponderance of the evidence, that at least one of the exceptions to the warrant requirement applies. *United States v. Bell*, 825 F. Supp. 3d 612, 616 (E.D. Va. 2025). If the government does not carry this burden, any "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Mayberry*, 125 F.4th 132, 144 (4th Cir. 2025) (quoting *United States v. Calandra*, 414 U.S. 338, 347–48 (1974)).

## IV.    ANALYSIS

This Motion is before the Court to determine whether there was a Fourth Amendment violation, and if so, whether suppression is warranted and to what extent. First, the Court considers whether Mr. Gaines had a reasonable expectation of privacy in the Volkswagen. Second, having found that Mr. Gaines had a reasonable expectation of privacy of the vehicle and its contents, the Court considers whether the inventory search exception applies. Third, finding that the inventory search exception does not apply, the Court considers whether the inevitable discovery doctrine applies. Finding that it does not, the Court then considers whether the exclusionary rule applies, and the extent to which suppression is warranted.

12

### A.    Reasonable Expectation of Privacy

Mr. Gaines has met his burden of establishing that he had a legitimate expectation of privacy in the Volkswagen. A person "who owns and possesses a car . . . almost always has a reasonable expectation of privacy in it." *Byrd v. United States*, 584 U.S. 395, 404 (2018). "[A] driver in lawful possession of a rental car, even when the person is not an authorized driver on the rental agreement, has a reasonable expectation of privacy in the car." *United States v. Grayon*, No. 2:17cr1185, 2019 WL 1427461, at *6 (D.S.C. Mar. 29, 2019) (citing *Byrd*, 584 U.S. at 398-99). Here, it is undisputed that Mr. Gaines was in lawful possession of the vehicle pursuant to a rental agreement with his name on it. *See* Def. Ex. C, ECF No. 26-3. As such, he had a reasonable expectation of privacy in the vehicle and its contents. *See United States v. Ghazaryan*, 685 F. App'x 222, 223 (4th Cir. 2017). The burden therefore shifts to the Government to prove that the warrantless search of Mr. Gaines's vehicle was nonetheless constitutional. In its attempt to do so here, the Government argues that the search falls under the inventory search exception. Gov't Resp. Opp'n at 7–10, ECF No. 29.

### B.    Inventory Search Exception

Police are often called upon to perform "community caretaking functions . . . 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *United States v. Treisman*, 71 F.4th 225, 231 (4th Cir. 2023) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). In exercising these functions, police "may search vehicles that have been properly impounded when

13

the goal is to 'secur[e] or protect[ ] the car and its contents.'" *Id.* at 234 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976)). Such an inventory is excepted from the Fourth Amendment's warrant requirement if "(1) the vehicle is in the lawful custody of the police; (2) the inventory search is routine and conducted pursuant to standard police procedures; *and* (3) the search aims to secure the car or its contents and not to gather incriminating evidence against the owner." *Id.* (emphasis added) (citing *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986)). Accordingly, the Court considers each of the three prongs of the inventory exception in turn.

### 1.    Lawful Custody

The first prong asks whether the vehicle was in the "lawful custody" of the police. A vehicle is in the lawful custody of the police if impoundment of the vehicle is "reasonable under the circumstances." *Treisman*, 71 F.4th at 234. Courts have found that impoundment of a vehicle is reasonable if a vehicle "represent[s] a nuisance where it was parked," *Cabbler v. Superintendent, Va. State Penitentiary*, 528 F.2d 1142, 1145–46 (4th Cir. 1975), or if "police justifiably doubted the vehicle's safety and operability[,]" *Bell*, 825 F. Supp. 3d at 617.

The Government contends that the vehicle was in the "lawful custody" of the police for two reasons: (1) the vehicle was parked in the middle of the road and would constitute a nuisance if it remained there; and (2) no one else was immediately present who could take lawful possession of the vehicle and the police sought to give protection to Mr. Gaines's personal effects. Gov't Resp. Opp'n at 8, ECF No. 29. These arguments are unsupported by the evidence before the Court.

### a.    *The vehicle did not represent a nuisance where it was parked.*

First, the vehicle was not parked in the middle of the road and therefore did not represent a nuisance where it was parked. At the hearing, Detective Beasley testified that the vehicle was parked one to two feet away from the curb on the right-hand side of the street, slightly past the stop sign. He agreed that there was room for two cars to drive parallel on that same street, with plenty of space, even with Mr. Gaines's vehicle parked near the curb. Indeed, in the body worn camera footage shown at the hearing, multiple cars did drive by Mr. Gaines's vehicle with no issue. *See generally* Beasley BWC. While the vehicle was parked past the stop sign, it was not impeding oncoming traffic from the cross-street. At worst, a vehicle pulling up behind Mr. Gaines's car would likely have to drive around it when approaching the stop sign to check for oncoming traffic. *Compare Cabbler*, 528 F.2d at 1145–46 (finding that the vehicle at issue represented a nuisance because it was parked in the driveway to the emergency room of a hospital).

The Court finds, and it is perhaps undisputed, that the car was improperly parked. Indeed, at the hearing, Detective Woolard testified that there were several parking tickets he could issue based on the improper parking of the vehicle. However, Detective Woolard further noted that he is *permitted* to tow vehicles after a vehicle has received three of such tickets, and he is *not required* to tow such vehicles. Accordingly, and considering the fact that multiple cars freely drove past the vehicle on the night of the search with no issue, the Court is hard-pressed to conclude that the vehicle would constitute a nuisance that impeded the flow of traffic.

15

>    b.    *The police did not make any reasonable effort to determine whether there was someone nearby who could lawfully take possession of the vehicle to avoid impoundment.*

Second, it is undisputed that there was no one present at the scene who could take lawful possession of the vehicle. However, the police did not make any reasonable effort to determine whether there was someone nearby who could lawfully take possession of the vehicle to avoid impoundment. Rather, Detective Beasley gave Mr. Gaines his *Miranda* warnings and immediately asked if he was the owner of the vehicle, providing no context for his question: he did not even *ask* if there was anyone who could come retrieve the vehicle. Beasley BWC at 17:34:32–37; 17:34:55–17:35:00. As discussed below, this failure runs contrary to guidance provided by the HPD Towed Vehicles Policy, which states that "[o]fficers are encouraged to release vehicles at the scene after verification of ownership/stolen vehicle status is made." Def. Ex. D. at 3, ECF No. 26-4. While Mr. Gaines was not actually the owner of the car (and therefore likely could not designate the release of the vehicle to another individual), the police did not make a real attempt to determine if anyone else could take lawful possession of the vehicle.

Nor did the police voice any concerns about the safety or operability of the vehicle. *Cf. United States v. Johnson*, No. 3:21cr29, 2022 WL 2373700, at \*21 (E.D. Va. June 30, 2022) (finding that the police "would not have permitted anyone to drive the car away from the scene of the traffic stop" because it could not have been lawfully operated); *Bell*, 825 F. Supp. 3d at 617 (finding that the decision to impound was

"reasonable under the circumstances" because credible officer testimony suggested that the police "justifiably doubted the vehicle's safety and operability").

In sum, the vehicle was not parked in the middle of the street—and was therefore not a nuisance—and the police did not make any attempt to determine if someone could take lawful possession of the vehicle. Accordingly, impoundment of the vehicle was unreasonable under the circumstances, and this factor weighs in favor of suppression.

### 2. Standard Procedures

Next, the inventory search exception requires the vehicle search to have been "routine and conducted pursuant to standard police procedures[.]" *Treisman*, 71 F.4th at 234. "[T]echnical compliance with a written policy" is not required, so long as the police "acted in accordance with standard procedures more generally." *United States v. Banks*, 482 F.3d 733, 740 (4th Cir. 2007) (upholding inventory search in the context of routine booking procedures upon arrest); *see also Wells v. Fuentes*, 126 F.4th 882, 894 n.13 (4th Cir. 2025) ("[I]nventory searches should generally follow department policy. But not every 't' need be crossed."); *Bell*, 825 F. Supp. 3d at 619 n.6 (same). The Government argues that the search was conducted based on the HPD towed vehicles policy (the "HPD Tow Policy") and that "any errors with the inventory search were merely procedural." Gov't Resp. Opp'n at 8, ECF No. 29; *see also* Def. Ex. 4, ECF No. 26-4. The Court disagrees with this characterization. Law enforcement failed to comply with its own standard policy in three significant ways: the officers (1) did not make a sincere attempt to determine ownership of the Volkswagen; (2) impounded a

17

rental car; and (3) failed to complete inventory sheets, strongly suggesting that the search was pretextual.

> a.   *The officers did not make a sincere attempt to determine ownership of the Volkswagen.*

First, the HPD Tow Policy addresses the impoundment of "vehicles which affect the efficient movement of vehicular traffic, impede traffic, or unattended/abandoned vehicles." *See* Def. Ex. 4 at 3, ECF No. 26-4. It provides:

> Officers are *encouraged* to release vehicles at the scene after verification of ownership/stolen vehicle status is made. Only the registered owner can designate who the vehicle may be released to.

*Id.* at 3-4 (emphasis added). Although HPD Tow Policy does not *require* officers to release vehicles at the scene, the actions of the officers in this case weigh against a finding that they acted in accordance with standard procedures more generally. The officers did not make a sincere attempt to determine ownership of the Volkswagen. Rather, they asked Mr. Gaines if he was the owner of the car without context and only after *Mirandizing* him. Beasley BWC at 17:34:32–37; 17:34:55–17:35:00.

> b.   *The officers impounded a rental car in clear violation of HPD Tow Policy.*

Second, the HPD Tow Policy states:

> NOTE: Vehicles which are being rented or leased *shall not be impounded. If the officer discovers this fact after the process is initiated, he/she shall discontinue the impoundment* and notify the rental or leasing company the vehicle is available for pickup.

Def. Ex. D at 4, ECF No. 26-4 (emphasis added). Here, the police knew—from start to finish—that Mr. Gaines was driving a rental car. According to Detective Boone's preliminary hearing testimony, the surveillance team was aware that the vehicle was

a rental before the pursuit even began. Hr'g Tr. at 7:14–19, ECF No. 18. Then, approximately 20 seconds into their search of the Volkswagen, they discovered a rental agreement for the car from "Avis" in the center console. Beasley BWC at 17:35:31–34.

At the hearing, Detective Beasley testified that, although he was familiar with Avis and knew that rental cars were often associated with rental paperwork, the rental paperwork did not draw his attention that that time, because he was focused on locating valuable items in the car. The Court does not find this testimony to be credible. At that juncture, any person familiar with rental paperwork would have likely recognized that the car was a rental. Considering the HPD Tow Policy, which states that rental vehicles "shall not be impounded," Def. Ex. D at 4, ECF No. 26-4, a reasonable officer conducting a true inventory would have paused to examine the paperwork and determine if the vehicle was a rental. As soon as the detectives discovered the car was a rental, they should have "discontinue[d] the impoundment." *Id.*

The officers did not do so here. Rather, Detective Beasley left the rental paperwork in the center console and continued rummaging through Mr. Gaines's belongings. Further, the detectives presented conflicting testimony about when the investigative team discovered that the Volkswagen was a rental car. Detective Beasley testified that he did not realize the car was a rental until he looked at the rental paperwork a second time, after the search was complete. However, when his own body worn camera footage was played back, he acknowledged that he had asked Detective Woolard about the car being a rental about a minute earlier. *See* Beasley BWC at

19

17:40:21–17:41:03 ("We need to verify whether it's a rental. It is a rental. I started to run the tags.").[10]

Accordingly, this search was a clear violation of HPD Tow Policy. The officers had reason to suspect that the car was rented before they even initiated the traffic stop, and they received additional information corroborating that suspicion in the form of the signed rental agreement shortly into the search.

> c.    *The officers failed to adequately and timely fill out tow sheets.*

Third, Mr. Gaines notes that HPD Sergeant Rummel did not fill out the tow sheet until 5:57 p.m., even though the search began at 5:35 p.m. and was completed by 5:38 p.m. Mot. at 13, ECF No. 26. Mr. Gaines argues that this is additional evidence that the search was not meant to "inventory" valuable items but was instead pretext for the search. *Id.* at 14. Even if the delayed filling out of the tow sheet is not a strict violation of standard procedure, it does weigh in favor of finding that the search was pretextual. If the officers were following standard policy and conducting a valid inventory search, they would have noted each item inventoried, given that they were taking "inventory" of the vehicle.[11] Here, under Inventory Information—

---

[10] In the Court's view, this statement from Detective Beasley confirms not only that he knew the Volkswagen was a rental car, but moreover it suggests that he knew that the fact that it was a rental car was important for determining the officers' next steps. Perhaps he was aware that HPD's Tow Policy prohibited the officers from impounding rental cars.

[11] There was some question at the hearing whether the HPD Tow Policy or the VSP tow policy should have controlled the search. While the Government's position was that the HPD Tow Policy controlled the search, the Court notes that even if the VSP policy so controlled, the search was also in violation of that policy. The VSP Vehicle Impoundment and Inventory Policy states, in pertinent part, "The sworn employee's

Contents, Sergeant Rummel simply wrote, "Nothing of value[.]" Mot. Ex. 2 at 2, ECF No. 26-2.[12]

*      *      *

Taken together, there is no doubt that the officers violated their own policy, and the Court does not agree that such violations are "merely procedural." Gov't Resp. Opp'n at 8, ECF No. 29. "[I]f a standard impoundment procedure exists, a police officer's failure to adhere thereto is unreasonable and violates the Fourth Amendment." *United States v. Proctor*, 489 F.3d 1348, 1354 (D.C. Cir. 2007). This factor weighs in favor of suppression.

### 3.      *Investigatory Motive*

To satisfy the third requirement of the inventory search exception, the vehicle search must have "aimed to secure the car or its contents and not to gather incriminating evidence against the owner[.]" *Treisman*, 71 F.4th at 236. If the inventory was

_____

motive for impounding a vehicle or other personal property and inventorying same must be protective and not investigative. If the sworn employee's motive in inventorying the vehicles or other property is investigatory, the sworn employee will obtain a search warrant." Def. Reply Ex. 1 at 1, ECF No. 31-1. It also provides, "The requirements for inventorying vehicles or other personal property are as follows: (a) The sworn employee must have a lawful basis for acquiring custody of the vehicle or other personal property; (b) All vehicles or other personal property must be inventoried; (c) Each inventory much be conducted promptly; (d) The scope (area to be examined) of the inventory examination must be reasonable. A vehicle or other personal property should not be dismantled in whole or in part unless evidence found during the inventory indicates hidden compartments or property located in usually inaccessible areas." *Id.* The Court finds that the motive for impounding and inventorying Mr. Gaines's vehicle was investigative. Even if it were not investigative, the officers did not comply with VSP tow policy by promptly and adequately detailing the inventory.

[12] HPD Tow Policy states: "The inventory shall include an inspection and complete listing of all articles of value left in the vehicle…Examples of items that will be inventoried include: bags, tools, clothing, and portable radios."

21

in fact "a pretext for a criminal investigatory search," the Government cannot rely on the inventory search exception. *Id.* The defendant bears the initial burden of producing some evidence of pretext. *See Banks*, 482 F.3d at 741 ("[The defendant] may only succeed . . . by showing that [the inventory] search was motivated by 'an investigatory police motive.'" (quoting *Opperman*, 428 U.S. at 376)). The defendant must point to "something" in the record "to suggest that the police were engaging in their criminal investigatory function, not their caretaking function," such as an officer's testimony. *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) (citation omitted). While a defendant must "produce[] objective evidence of pretext," the prosecution retains "the ultimate burden of proof regarding application of the inventory-search exception[.]" *United States v. Anderson*, 101 F.4th 586, 594 (9th Cir. 2024).

In this case, it is abundantly clear that the vehicle search was conducted to gather incriminating evidence against Mr. Gaines. The officers followed Mr. Gaines from the Clover Residence to the Melborne Residence. When Mr. Gaines left, the takeaway team was ordered to follow his car and wait for him to commit a traffic infraction. Detective Woolard testified that, in his experience, most people commit multiple traffic infractions in a day, and it is not difficult to catch someone committing a traffic infraction. Then, after Detective Woolard allegedly saw Mr. Gaines make multiple traffic violations—none of which were covered on dash camera or body-worn camera—other members of the takeaway team attempted to conduct a traffic stop on the HRBT. When Mr. Gaines did not pull over on the bridge-tunnel, the officers decided to "work it as an evade." Mr. Gaines was traveling with the flow of traffic, and

22

he took the first exit after the bridge-tunnel and came to a stop at a well-lit area. He parked his vehicle, exited, and complied with every direction provided by the officers. When asked why he didn't stop earlier, he responded credibly that he pulled over at the first safe opportunity. The officers then moved quickly and efficiently to accomplish the purpose of their traffic stop, which was, as Detective Beasley testified, to further the narcotics investigation.

The officers did not carefully document the items discovered in the Volkswagen, as one might if they were conducting a true inventory as a "caretaking function." After the detectives discovered the sealed packages believed to contain cocaine, they fixated on those packages only. Mr. Gaines has produced objective evidence of pretext and the Government has not met its burden of proof on the third prong of the inventory search exception.

*     *     *

As the Government has failed to meet its burden of proof on all three prongs of the inventory search exception, the Court finds that that exception does not apply. Therefore, the search was constitutionally deficient.

### C.     Inevitable Discovery

The Government argues that, even if the search was constitutionally deficient, the evidence would have inevitably been obtained via lawful means. Evidence derived from an unconstitutional search may be admissible under the inevitable discovery exception to the exclusionary rule "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been

23

discovered by lawful means." *United States v. Alston*, 941 F.3d 132, 137–38 (4th Cir. 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *Id.* at 138. The Government makes two arguments with respect to inevitable discovery and ultimately fails to meet its burden.

First, the Government argues that, had law enforcement followed proper protocols and called the rental car company, Avis would have retrieved the car, discovered the cell phone and backpack with cocaine, and notified the Norfolk Police Department to retrieve the evidence. Gov't Resp. Opp'n at 10–11, ECF No. 29. In support of this argument, at the hearing, the Government introduced an affidavit from David Erhardt, a Security Manager for Avis-Budget Rental Cars.[13] Mr. Erhardt states that he has been employed by Avis for four years and is responsible for loss, theft, and legal cases involving Avis-Budget. He further states:

> When a rental car is returned to Avis-Budget, the vehicle is thoroughly inspected for left property. If items are left in the vehicle upon return, the contents of the item are inspected to determine its nature and whether the item contains any items of value or the presence of contraband . . . Not infrequently, items of value or contraband are left in the vehicles that are returned. The Avis-Budget employees inspecting the vehicle must examine these items to determine whether they fit into either of these categories. If the discovered item is suspected of being or is determined to be contraband, law enforcement is contacted and the item is surrendered to them. In situations where the renter of the vehicle was arrested in the vehicle, Avis-Budget employees pay particular attention to the possibility that contraband may be present.

---

[13] The affidavit was not filed on the docket as an exhibit prior to the hearing. During the hearing, it was marked as Government Exhibit 5. Min. Entry at 2, ECF No. 39.

The Court is unmoved by this argument and the affidavit. The information in this affidavit is crucial to the Government's argument that the inevitable discovery doctrine should apply here. Mr. Erhardt should have been called to testify so that he could be cross-examined by defense counsel. Without an opportunity to further question Mr. Erhardt, this declaration provides little clarity to the Court: In which Avis location does Mr. Erhardt work? Does this policy apply to all Avis locations? Is the policy written? Are Avis employees trained in how to identify contraband when collecting items that are left in rental cars? Are they directed to open bags within bags, and open sealed black bags? If Mr. Gaines had not been arrested pursuant to a pretextual stop, would he have recovered his personal items in the rental car before the Avis employees uncovered the suspected contraband? Without such clarity, the affidavit carries little weight.

Second, the Government argues that even if the rental company had not retrieved the vehicle, "the car would have been abandoned property in the middle of the road, which NPD would have found, and contacted the tow company to retrieve[.]" Gov't Resp. Opp'n at 11, ECF No. 29. However, as discussed previously, the Court disagrees that the vehicle was in the middle of the road. Furthermore, the suspected cocaine was in sealed bags inside a backpack and the Government offered no evidence that the tow company would have found such contraband prior to towing the car.

To rely on the inevitable discovery doctrine, the Government must do more than show that police *could* have uncovered the unlawful evidence via alternative means, they must show that the police *would* have uncovered the evidence. The Gov-

25

ernment has failed to do so. Assuming *arguendo* that the officers properly stopped Mr. Gaines, the Government has not shown that the police *would* have uncovered the evidence. Notably, the Government made no argument that police officers had probable cause to search Mr. Gaines's vehicle for evidence of a crime, and the Court is not convinced that the police *would* have obtained the evidence *unless* they utilized the traffic stop and inventory search as an end-run around a search supported by probable cause. Consequently, the inevitable discovery doctrine does not apply.

### D.    Exclusionary Rule

Having found that Mr. Gaines had a reasonable expectation of privacy of the Volkswagen, and that neither the inventory search exception nor the inevitable discovery doctrine apply here, the Court must now consider what, if any, remedy is appropriate with respect to the evidence obtained as a result of the illegal search and seizure of the Volkswagen. The Supreme Court "generally ha[s] held that one whose Fourth Amendment rights are violated may successfully suppress evidence obtained in the course of an illegal search and seizure[.]" *Rakas v. Illinois*, 439 U.S. 128, 138 (1978). This is known as the exclusionary rule. *United States v. Lowers*, 170 F.4th 134, 157 (4th Cir. 2026). However, "the Supreme Court has 'limited the exclusionary rule's operation to only those situations in which its deterrent purpose is thought most efficaciously served.'" *Lowers*, 170 F.4th 134, 158 (4th Cir. 2026) (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)) (citation modified). Courts should apply the exclusionary rule as a last resort, and only where its application would result in appreciable deterrence. *Id.*

Here, the exclusion of this evidence will result in appreciable deterrence. As a result of this ruling, the Court sends a message to law enforcement that the inventory search exception and inevitable discovery doctrine cannot be used as a shortcut to obtain evidence. The officers in this case could have attempted to establish probable cause for their search, but they did not. Instead, they stopped Mr. Gaines and directly proceeded to conduct an unconstitutional search while calling it an "inventory search."

### E.     Warrants Containing Tainted Information

"The exclusionary rule applies to evidence obtained as a direct result of an illegal search, as well as evidence later discovered and found to be derivative of an illegal search, known as the fruit of the poisonous tree." *Id.* at 157(internal quotation marks omitted and citation modified). A warrant obtained using information found as the result of an unlawful search can only stand if "sufficient untainted evidence was presented in the warrant affidavit to establish probable cause," rendering the warrant valid. *United States v. Karo*, 468 U.S. 705, 719 (1984); *see also United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011) (same).

Here, the search of the Volkswagen directly resulted in the seizure of cocaine and other physical evidence, which must all be suppressed as direct evidence from the search. Furthermore, the affidavit submitted in support of the search warrant for Mr. Gaines's cell phone includes the following statements derived from the illegal search of the Volkswagen:

27

- An inventory search of his vehicle was conducted which resulted in the seizure of approximately five kilograms of suspected cocaine and $30,383.00 in US Currency.

- The evidence [including the cell phone] was tagged into Hampton Police Divisions Property and Evidence tag number 12576-25.

- It was also discovered by way of the rental car agreement that Gaines rented the vehicle on this date at approximately 1315hours [sic]. The rental agreement was located in his personally carried bag.

- A furtherance search warrant was written and executed at 19 Melborne Place, Hampton. As a result of the warrant marijuana, crack cocaine, and a shotgun were recovered. One felony arrest was made based on the warrant execution.

Def. Ex. 5 at 5–7, ECF No. 26-5. After excising these statements, there remains little if any basis to believe that a search of the cell phone would reveal evidence of drug distribution. *See Bell*, 825 F. Supp. 3d at 622 ("The affidavit that the Government used to obtain a warrant to search Defendant's smartphone did indeed rely in the main on the evidence police had recovered from the vehicle search. Once that evidence is 'excised' from the affidavit, there remains little if any basis for believing that a search of the smartphone would reveal evidence of [drug] distribution—the sole objective of the search. The smartphone evidence must therefore be suppressed.") (internal citations omitted). Accordingly, the contents of Mr. Gaines's cell phone must be suppressed.

## V.    CONCLUSION

As stated in the Court's previous Order (ECF No. 40), and for the foregoing reasons, the Motion (ECF No. 26) is **GRANTED**.[14] All evidence seized directly from the illegal search of the Volkswagen, as well as all data from Mr. Gaines's phone, is hereby **SUPPRESSED**. The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

/s/

Arenda L. Wright Allen
Senior United States District Judge

July 27, 2026
Norfolk, Virginia

---

[14] In the Court's previous Order (ECF No. 40), the parties were directed to contact the Courtroom Deputy within seven (7) days of that Order to reschedule trial, if necessary.